UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
MICHIGAN SOUTHERN DIVISION

WACKER NEUSON PRODUCTION
AMERICAS, LLC, a Wisconsin limited
liability company,

                Plaintiff,

v

CITY OF NORTON SHORES, a Michigan
Municipal Corporation,

                Defendant.

Case No. 1:19-cv-00018-JTN-ESC

**HON. JANET T. NEFF**

| | |
|---|---|
| VARNUM LLP<br>Adam J. Brody (P62035)<br>Jeffrey D. Koelzer (P78602)<br>Attorneys for Plaintiff<br>333 Bridge St NW<br>PO Box 352<br>Grand Rapids, MI 49501-0352<br>(616) 336-6000 | GRAVIS LAW, PLLC<br>Douglas M. Hughes (P30958)<br>Enrika L.F. McGahan (P55860)<br>John M. Karafa (P36007<br>Attorneys for Plaintiffs<br>120 W. Apple Avenue<br>Muskegon, MI 49440<br>(231) 726-4857 |

**<u>BRIEF IN SUPPORT OF DEFENDANT CITY OF NORTON SHORES' RESPONSE IN
OPPOSITION TO PLAINTIFF WACKER NEUSON PRODUCTION AMERICAS, LLC'S
MOTION FOR LEAVE TO FILE FIRST AMENDED ANSWER TO COUNTERCLAIM</u>**

## I.  Statement of the Case

Plaintiff Wacker Neuson operated its business of construction equipment manufacturing and sales within a legislatively designated Industrial Facilities District located at 1300 E. Mt. Garfield Road in the City of Norton Shores.

Pursuant to Public Act 198 of 1974 the Michigan Department of Treasury issued Wacker an Industrial Facilities Exemption Certificate (*IFEC*) in May 2008 which abated Wacker's real and personal property tax obligations for its business operations within the industrial district. The IFEC had a timeline of 12 years, from December 2008 to December 2020.

The IFEC saved Wacker approximately $100,000.00 annually on its property taxes. To get an Act 198 IFEC, Wacker had to do essentially 2 things. It had to apply for it; and, it had to enter into an Act 198 Agreement with the City of Norton Shores governing the tax abatement terms and conditions. Wacker did both.

The City of Norton Shores adopted a Resolution approving Wacker's application for an IFEC for the statutory maximum period of 12 years. In exchange for this consideration, among other things, Wacker executed its Act 198 Agreement committing to Norton Shores that its operations would remain in the City of Norton Shores for at least the 12 years covered by the IFEC. If it breached its commitment in this regard, Wacker would be obligated to pay the amount it would have paid in property taxes had the IFEC not been in effect.

In other words, Wacker could not keep its substantial tax savings over the years of operation if it breached its agreement to stay in the City for the full duration of the IFEC. Wacker did breach its agreement by closing its operations in Norton Shores,

2

selling its facility to another business, and relocating to Wisconsin, well before satisfying its 12 year commitment.

Since it breached its Act 198 Agreement, Wacker is obligated under its specific terms to pay "*an amount equal to those taxes it would have paid had the abatement not been in effect.*" [1]

After receiving Norton Shores' invoices on its tax liabilities, Wacker initiated this declaratory judgment action, requesting a determination of its non-liability. Wacker's reasons for avoidance of its tax liabilities has been a bit of a song and dance with an evolving theme.

It will first be helpful to review the statutory relationships between (1) <u>local governmental units</u> approving tax abatement agreements with profit corporations operating within their jurisdiction (*here, Norton Shores*); (2) <u>Michigan's Department of Treasury</u>, with the statutory authority to issue tax abatement certificates to profit corporations; and, (3) <u>profit corporations</u> seeking the significant savings in business operations through governmentally approved tax abatements, here Wacker Neuson Production. These relationships are governed under Public Act 198 of 1974.

### Act 198 Michigan Property Tax Abatements

The State of Michigan provides legislatively enacted incentives for eligible businesses to invest in industrial districts within the boundaries of Michigan cities, townships, and villages. It does so through property tax abatements.

---

[1] On September 19, 2018, Norton Shores invoiced Wacker Neuson Corporation $966,943.65. (**Exhibit 5 – Wacker's Complaint**, ¶29, referencing its Exhibit C. Wacker then alleges in its complaint that Norton Shores subsequently invoiced a revised amount of $951,346.94 on November 7, 2018. What Wacker does not state in its complaint is that the revised amount was the product of Wacker's own finance office's review, Accounting Manager Matt Snyder, who claimed Wacker's entitlement to a deduction for the winter tax bill over 4 months as a new company had taken over the property and was obligated for that time frame. Norton Shores agreed with this reasoning and sent the revised invoice. (**Exhibit 7 - Ryan Gile dep. Tr. Pp. 28, 34-37**).

Local governmental units encourage the development of industrial zones by profit motivated businesses looking for a location to establish their business operations. The businesses agree to set up operations, commit to projected expansion and growth, and remain for a specified period of time.

In exchange the local government agrees to approve significant property tax abatements in favor of the business. Tax savings facilitate the business's investment and profit objectives. For example, Wacker was saving about $100,000.00 annually in its Norton Shores tax abatements. The savings was undisputed. (see footnote 1).

Wacker's own Chief Operating Officer, Ryan Gile, acknowledged Wacker's substantial savings in his April 27, 2018 email to Tom Bergy of TGW, the business which purchased Wacker's property with over 2 years left on the industrial facilities exemption certificate:

> "*Hello Tom,*
>
> *I am the VP of Finance at Wacker Neuson North America and I wanted to reach out to give you my contact in case there is anything we can do to assist you with the transition of the Garfield Rd building later this year…. **One other item you may not be aware of is the property TGW is buying was approved for a significant tax abatement, we have saved nearly $950,000.00 over the past 10 years and there is still 2 years left on the abatement** program which your company might be eligible for…*"

(**Exhibit 7** - Gile dep. Tr. P. 94).

The negotiated, good faith-based relationship between Wacker and Norton Shores was predicated on a fairly straightforward quid pro quo. The ability of profit corporations to benefit from property tax abatements, while its corporate neighbors pay, is sanctioned by Act 198 of the Public Acts of 1974 ("**Act 198**").

Pursuant to Act 198 a local government may hold a public hearing and adopt a resolution to approve the establishment of an Industrial Development District. Once the

district is properly established an eligible corporate entity operating within the district may apply for an abatement on the real and personal property taxes it would otherwise be obligated to pay.

Act 198 limits such tax abatement benefits to a maximum of 12 years. Further, such tax abatements must be approved by the State of Michigan and by the local unit of government.

The business applies for the abatement using Michigan Department of Treasury Form 1012. The local governmental unit adopts a resolution at a public hearing approving the corporation's application. It also sets the number of years the corporation will be permitted to profit from the tax abatements, again, up to the maximum of 12 years.

Following the local government's public hearing the corporation's application is filed with the Michigan State Tax Commission (*STC*). The STC reviews the corporation's application and has the final say on whether it is granted.

Before the STC can approve the issuance of an Industrial Facilities Exemption Certificate to a corporation, it must determine that the local unit of government has entered into a written agreement with the corporate entity governing the terms and conditions of the corporate tax abatements. Such agreements are referred to as *Act 198 Agreements*.

**II. Wacker's Tax Abatements In Norton Shores**
**a. Wacker's Application**

In May 2007 Norton Shores established an Industrial Development District pursuant to Act 198 at a location in the City with a common address of 1300 E. Mt. Garfield Road. (**Exhibit 1**- Resolution).

5

Wacker Corporation is a manufacturer of construction equipment. It is a publicly traded corporation with a global presence. By application dated November 1, 2007, Wacker applied for property tax exemptions in the City of Norton Shores for the operation of its industrial facility. **(Exhibit 2-** Wacker's Application on Department of Treasury Form 1012).

Wacker's corporate officer, Chris Barnard, signed the application from Wacker's corporate offices at N92 W 15000 Anthony Ave., Menominee Falls, WI 53051. This address today remains Wacker's corporate headquarters for its North America operations. [2]

Wacker's application certified its familiarity with Act 198's provisions. Wacker described itself in its application for the tax exemption certificate as a "worldwide leader in medium duty construction equipment, manufacturing, sales, and marketing."

In its application Wacker Corporation detailed its plans for facilities improvements and equipment acquisition in its operations at the Mt. Garfield Road Industrial Facilities District. It stated the value of the expansion. It provided the data required under Act 198 for the consideration of its application by Norton Shores and the Department of Treasury.

Wacker requested the benefits of an Industrial Facilities Tax Exemption Certificate for 12 years, the maximum number years permitted under Act 198.

The State of Michigan Tax Commission is the agency charged with issuing tax exemption certificates. Before the Tax Commission issues a tax exemption certificate to a business applicant, it must first ascertain that there is an Act 198 Agreement between

---

[2] The parties, through counsel, agreed that in the event mediation did not resolve the case depositions earlier requested by the City including Wacker's 30(b)(6) witness, Chris Barnard the former COO, and Lawrence O'Toole, among others would be scheduled.

the business applicant and the local governing unit. In this regard, MCL 207.572(1)

states in relevant part:

> *(1) A new industrial facilities exemption certificate shall not be approved and issued ..., unless a written agreement is entered into between the local governmental unit and the person to whom the certificate is to be issued, and filed with the department of treasury.*

### b. Wacker's and Norton Shores' Act 198 Agreement

In November 2007, Wacker Corporation, of N92 W. 15000 Anthony Avenue,

Menominee Falls, WI 53051, and the City of Norton Shores, executed their Act 198

Agreement.

In fact, Wacker CEO Christopher Barnard signed it on November 1, 2007, the

same date of his application to Norton Shores and the State of Michigan for tax

exemptions. Norton Shores signed it on November 12, 2007. **(Exhibit 3- Act 198**

**Agreement).**

The parties' November 2007 Act 198 Agreement states in pertinent part:

"*RE: Act 198 Agreement with the City of Norton Shores*

**Wacker Corp. (The Company) has submitted an application to the City of Norton Shores (City) for the granting of an Industrial Facilities Exemption Certificate** *(IFT) pursuant to Act 198, P.A. 1974, as amended.*

**To encourage the granting of the IFT** *and in recognition of the investment the City will be making toward the economic growth of the Company and thus the community,* **I hereby agree on behalf of the Company:**

> 1) *The attached information sheet is an integral part of this agreement and outlines the investment the Company intends to make.*
> 2) *The Company will submit a letter to the City no later than January 10th immediately following the second year after the issuance of the IFT certifying:*
>
>> a) *Number of jobs created or retained*
>> b) *Actual cost for both real and personal property acquisitions*
>> c) *If the number of jobs created or total project cost differ from that*

7

*described in the information sheet, a disclosure explaining the variance is required.*

3) *The Company will recertify the current employment information outlined above every year through the expiration of the IFT.*

4) *The Company understands that if employment has not been retained or reached, or the expansion or improvement was not substantially completed as described in the application and information sheet, the City has the right to reduce the term or revoke the IFT.*

5) ***The applicant shall remain within the local unit during the period of time for which the abatement has been approved and, if the applicant relocates, substantially reduces employment and/or operations, or closes the facility, the applicant shall pay to the affected taxing units an amount equal to those taxes it would have paid had the abatement not been in effect.***

*By the signatures below, representatives of both the Company and City acknowledge their responsibilities towards the successful completion of the project. It is understood certain economic conditions may delay or even prohibit the maintenance of the Company's goals. Prior to any City action concerning the reduction or revocation of an IFT, or recapture of abated taxes, the Company will have the right to a public hearing before the City Council."*

***(emphasis added)***

c. **The State Tax Commission's Issuance To Wacker of IFEC 2008**

Having received and considered Wacker's Application and the parties' Act 198 Agreement, the STC approved the deal and issued on May 12, 2008, Industrial Facility Exemption Certificate No. 2008-038 (hereafter "**IFEC 2008**"). (**Exhibit 4- IFEC 2008**).

IFEC 2008 granted Wacker tax exemptions, commencing December 31, 2008, to remain in effect for 12 years, until December 30, 2020, for both real and personal property.

In its <u>Application</u> Wacker requested the benefits of property tax abatements for the maximum statutory period of 12 years. In its <u>Act 198 Agreement</u> Norton Shores agreed to permit Wacker to have the benefit of the statutory maximum period in

8

exchange for Wacker's expressed commitment to the city in the Agreement to "*remain with the local unit during the period of time for which the abatement has been approved …*", i.e. <u>until December 30, 2020</u>. *(Exhibit 3-Act 198 Agreement, ¶5).*[3]

The Act 198 Agreement stated unequivocally the negotiated consequences in the event Wacker did not fulfill its obligation to the City in any one of several ways, to wit: "*and, if the applicant relocates, substantially reduces employment and/or operations, or closes the facility, the applicant shall pay to the affected taxing units an amount equal to those taxes it would have paid had the abatement not been in effect.*" *(Exhibit 3-Act 198 Agreement, ¶5).*

Wacker began operation of its industrial facility at 1300 Mt. Garfield Road and received real and personal property tax abatements during each year of its operations. However, by 2018 Wacker closed its facility and relocated operations to Wisconsin.

By doing so, it breached the specific terms of its Act 198 Agreement and became liable to the City of Norton Shores in ***an amount equal to those taxes it would have paid had the abatement not been in effect.***

At the risk of belaboring the obvious the contract language is not subject to more than one reasonable interpretation. It required Wacker to "remain within the local unit during the period of time for which the abatement was approved." The abatement was requested by Wacker and approved by the governmental agencies for the statutory maximum period of 12 years, concluding December 2020.

Wacker closed its business operations and vacated Norton Shores and Michigan well before December 2020. It clearly breached its contractual commitment. Therefore, in

---

[3] Additional Act 198 Agreements were entered into between the parties during Wacker's operations over the years when, for example, Wacker obtained additional property that it wanted to be subject to the statutory privileges of tax abatements.

accordance with the balance of the terms Wacker became obligated to Norton Shores in "an amount equal to those taxes it would have paid had the abatement not been in effect." That amount was $951,346.94, and has grown as of September 2019 to **$1,017,941.23**.

How then does Wacker justify not paying what is contractually due? The answer depends on when you ask that question. Let's review Wacker's excuses for keeping the million dollars it saved despite its breach.

### III.    Wacker's Purported Arguments In Support of Non-Payment

Wacker initially emphasized in its complaint that the Act 198 Agreement referred to Wacker Corporation as the "Company", but the paragraph that obligated the business to remain with the local unit for a specified period of time did not reference the "Company" but rather used the term "applicant." From this disjointed premise Wacker tortures a plain reading of the contract and attempts to claim that the term "applicant" might apply to some hypothetical, future, non-party to the contract, unforeseen, and unforeseeable. At paragraph 19 of Wacker's complaint it alleges:

> *19. As such, the form Agreement contemplates and provides for circumstances where the "Company" relocates but the "applicant" remains in place, such as when the underling IFT exemption Certificate is transferred from the "Company" to a new "applicant" that has purchased the facility, as would happen in this case.*

Wacker maintained this position as well in its published letter to city council, dated December 13, 2018, wherein Wacker devotes an entire paragraph of advocacy to the point that –

> "notably absent from paragraph 6 (ironically, the very paragraph upon which the City relies for its claim that Wacker Neuson must refund its prior tax savings) is any reference to the Company. Rather, that paragraph references 'the applicant.' This paragraph was clearly intended to protect Wacker Neuson from exactly the situation it is now facing – a situation in which the underlying IFT exemption Certificate has been transferred to a new applicant."

**(Exhibit 5 –** Wacker's complaint, ¶29; Wacker Complaint, ECF No. 1, exhibit E, PageID. 51-532, December 13, 2018 Letter to Norton Shores City Council**, p.3)**

Wacker's main pitch in its initial pleadings and pitch to city council, as curiously desperate if not recklessly frivolous as it was, that the term "*applicant*" in the Act 198 Agreement between the parties does not really mean Wacker – *even though identified in the preamble as the company who has submitted an application to the City of Norton Shores for the granting of an Industrial Facilities Exemption Certificate (IFT) pursuant to Act 198-* the very purpose of the entering into the agreement in the first place, was not its sole argument.

In an apparent attempt to write into the Act 198 Agreement equitable terms otherwise nowhere stated, Wacker also claimed that its departure from Norton Shores paved the way for a greater economic presence, TGW, to buy the facilities and assume its operations in the industrial district. Essentially, Wacker essentially claims to have done Norton Shores an economic favor in this regard:

> "*Indeed, the City understands that TGW's presence at and ownership of the subject property actually places the City in a better financial position, as the City recently approved an IFT exemption for TGW to make a further $2.5 million real estate investment at the subject property. Thus, at the end of the day, there is no question that the spirit of the Act 198 agreement has been met, and in fact exceeded, given the collective investments made by Wacker Neuson and TGW.*"

**(Exhibit 5 –** Wacker's complaint, ¶¶24-28; Wacker Complaint, ECF No. 1, exhibit E, PageID. 51-532, December 13, 2018 Letter to Norton Shores City Council**, p.3)**

What does TGW's interest in investing in commercial property vacated by Wacker have to do with Wacker's 2008 commitment to remain until 2020? More baffling, Wacker makes the argument that TGW is in fact the "applicant" referred to in the November 2007 Act 198 Agreement entered between the parties. *(***Exhibit 3-Act 198 Agreement***)*.

11

Case 1:19-cv-00018-JTN-SJB   ECF No. 68 filed 03/11/20   PageID.704   Page 12 of 14

But TGW's presence does not, in any legally significant way, alter the fact Wacker benefitted from contractually promised tax abatements to the tune of about a million dollars (income?) and then left town in breach of its own contractual commitment to operate in the city for at least 12 years; a material term of the Act 198 Agreement which enabled Wacker to earn the million dollars savings.[4]

It breached, now it owes what it promised to pay in such circumstances.

Most recently, Wacker has attempted to change its argument once again. By way of its motion before this Honorable Court, it seeks leave to file its amended answer to the City's counterclaim. Based on the procedural history set forth in the City's response in opposition to Wacker's motion, it is submitted that the motion should be denied.

Wacker Neuson Production argues that it only recently discovered the original contracting documents from 2007 and 2008 by Wacker Corporation. It claims it is not responsible for the first two years of Wacker Corporation's operation at the Norton Shores facility. The City respectfully submits that the evidence thus far presented on the issue demonstrates that Wacker Neuson Production Americas, LLC is a wholly owned subsidiary of Wacker Neuson Corporation, and that Wacker Neuson Corporation – "which used to be known as Wacker Corporation" – is the sole member of Wacker Neuson Production Americas, LLC, a Wisconsin Limited Liability Company. (**Exhibit 6** – Wacker's Organizational Documents).

---

[4] Wacker's COO, Ryan Gile, shot off beyond the stratosphere in suggesting that Wacker "did not benefit" from tax savings, even though he sent an email to TGW Officer Tom Bergy that Wacker had saved over $950,000.00 in the tax abatement program. Asked to affirm that Wacker saved about $100,000.00 annually, Mr. Gile responded: "A: *No, only to what Norton Shores wanted to claim. If you were to build the facility in Mexico, you would pay a dollar. Norton Shores charged millions more than what we could have saved.* Q: Who forced Wacker Neuson to build the facility in Norton Shores? A. Nobody. Q: Why are you mentioning Mexico" What does that have to do with anything? A: *What does Norton Shores saving – they didn't save anything. We didn't save anything. It cost money to being in Norton Shores. We paid taxes every year".* **Exhibit 7** - *Gile dep. Pp. 50-51.*

Additionally, as set forth in the City's statement of procedural history in its response in opposition, Wacker Neuson has not revised or supplemented its Complaint, or its discovery responses. It only seeks to amend its answer to the City's counterclaim. But all of the averments by Wacker Neuson in its pleadings, its responses to discovery requests, and the deposition testimony of its financial officer all lead to the conclusion that Wacker Neuson Corporation which used to be known as Wacker Corporation, and which began in 2010 operating as Wacker Neuson Production Americas, LLC are one in the same.

From 2008 until it vacated the City in 2018, Wacker Neuson operated at 1300 E. Mt. Garfield Road at the same manufacturing facility, the same warehouse facility, in the same line of business, with essentially the same employee pool, with the same contact representatives to the City. (**Exhibit 9** – Mark Meyers dep tr. pp 55-56).

They make this claim even though there was no change in material addresses, operations, facilities, equipment, etc.; merely a change brought about by an operating agreement.

The Court should grant a motion to amend pleadings freely when justice so requires. Fed. R. Civ. P. 15(a)(2). *Jackson v Cleveland*, 925 F.3d 793, 809 (6th Cir. 2019). Defendant/Counter-Plaintiff City of Norton Shores has submitted information in its response in opposition, based on discovery to date on other issues, that supports the proposition that Wacker's motion is futile, as the corporate entities have co-existed and operated as one in the City of Norton Shores.

Further, the procedural history shows undue delay in Wacker's presentation of this motion for amendment of pleadings, as it has been fully aware of the historical proceedings. For this reason, the Court may deny its motion. *Forman v Davis*, 371 U.S. 178, 182 (1962).

However, in the event this Court deems it proper to grant Wacker Neuson's motion, the City of Norton Shores respectfully requests that an amend scheduling order provide an opportunity for the amendment of pleadings and/or additional discovery to address the issues presently raised.

GRAVIS LAW

Dated:  March 11, 2020

/s/ John M. Karafa
John M. Karafa (P36007)
Attorney for Def. City of Norton Shores
120 W. Apple Avenue
Muskegon, MI 49440
(231) 726-4857
jkarafa@gravislaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of the Court via CM/ECF and served upon all counsel or parties of record via Electronic Notice on March 11, 2020.

/s/ John M. Karafa
John M. Karafa, Gravis Law, PLLC

14