UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

WACKER NEUSON PRODUCTION
AMERICAS, LLC,

                       Plaintiff/Counter-Defendant,

v

CITY OF NORTON SHORES,

                 Defendant/Counter-Plaintiff.

Case No. 1:19-cv-00018-JTN-ESC

Hon.  Janet T. Neff

| | |
|---|---|
| VARNUM LLP | GRAVIS LAW PLLC |
| Adam J. Brody  (P62035) | Douglas M. Hughes (P30958) |
| Jeffrey D. Koelzer (P78602) | Enrika L.F. McGahan (P55860) |
| Attorneys for Plaintiff/Counter-Defendant | John M. Karafa (P36007) |
| 333 Bridge St NW | Attorneys for Defendant/Counter-Plaintiff |
| PO Box 352 | 120 W. Apple Avenue |
| Grand Rapids, MI 49501-0352 | Muskegon, MI 49440 |
| (616) 336-6000 | (231) 726-4857 |
| ajbrody@varnumlaw.com | dhughes@gravislaw.com |
| jdkoelzer@varnumlaw.com | jkarafa@gravislaw.com |

**JOINT NOTICE IN RESPONSE TO SEPTEMBER 10, 2020 ORDER [DOC. 77]**

NOW COME the parties, Plaintiff/Counter-Defendant Wacker Neuson Production Americas LLC ("WNPA") and Defendant/Counter-Plaintiff the City of Norton Shores ("City"), by and through their respective counsel, and state for their Joint Notice in response to this Court's September 10, 2020 Order [Doc. 77] as follows:

**I.    UNCONTROVERTED FACTS, WHICH THE PARTIES AGREE MAY BE ACCEPTED AS ESTABLISHED FACTS;**

The parties state the following undisputed material facts; however, the parties agree there may be other relevant facts that are not identified in the following.

1.  The City of Norton Shores is a municipal corporation located in Muskegon County.

2. Pursuant to Act 198 of the Public Acts of 1974, MCL 207.551 et seq. ("Act 198") a city, by resolution of its legislative body, may establish an Industrial Development District.

3. In May 2007 the City of Norton Shores ("City") established an Industrial Development District on property located at 1300 E. Mt. Garfield Road, Norton Shores, MI.

4. Pursuant to Act 198 a business may apply for to the municipality for an Industrial Facilities Exemption Certificate ("IFEC") which, if an IFEC is issued to the business, real and personal property taxes are abated for the duration stated in the IFEC.

5. In a written application dated November 1, 2007, "Wacker Corp." of N92 W. 15000 Anthony Ave., Menominee Falls, WI 53051, by its President and CEO, Christopher Barnard, applied for an IFEC to operate its production facility at the City's Industrial Development District at 1300 Mt. Garfield Road.

6. Wacker Corporation's November 2007 application requested that the IFEC be approved for 12 years, the maximum duration for tax abatements allowed under law.

7. The City approved Wacker Corporation's November 2007 application.

8. The City and Wacker Corporation entered into an Agreement ("Act 198 Agreement"), approved by Wacker Corporation on November 1, 2007, and by the City on November 12, 2007, containing commitments between the parties regarding "the granting of an Industrial Facilities Exemption Certificate Pursuant to Act 198, P.A. 1974, as amended."

9. Pursuant to Act 198 and the parties' Act 198 Agreement, The State of Michigan Tax Commission issued an IFEC numbered "2008-038" to Wacker Corporation ("IFEC 2008").

10. IFEC 2008 was approved for 12 years, commencing December 31, 2008 and ending December 30, 2020.

11. Wacker Corporation filed an amended application for certificate of authority in September 2008 with the State of Michigan to change its name to "Wacker Neuson Corporation", with an effective date of April 9, 2008.

12. Wacker Corporation (and effective April 9, 2008 "Wacker Neuson Corporation") received tax savings under the IFEC 2008 in 2009 of $111,599.73 and in 2010 of $103,513.62 for a total of $215,113.35.

13. Wacker Neuson Corporation, in 2010, formed three wholly owned subsidiaries including Plaintiff/Counter-Defendant "Wacker Neuson Production Americas LLC" ("WNPA") of N92 W. 15000 Anthony Ave., Menominee Falls, WI 53051.

14. In January 2011 WNPA applied for the transfer of IFEC 2008 previously held by Wacker Corporation, and the City approved the Transfer by resolution in March 2011.

15. In furtherance of WNPA's application for transfer of the IFEC 2008 the City and WNPA entered into an Act 198 Agreement in 2011 approved by Wacker Neuson Corp. as managing member of WNPA, dated January 18, 2011, with the City's approval dated February 9, 2011.

16. Pursuant to WNPA's application for transfer of the IFEC 2008 and its Act 198 Agreement with the City, the State Tax Commission approved transfer of the IFEC to WNPA.

17. WNPA did not enter into any Act 198 Agreements or receive any tax abatements in its name prior to 2011.

18. Following the transfer of the certificate from Wacker Corporation to WNPA, the City did not attempt to try to recapture taxes previously abated in favor of Wacker Corporation.

19. In 2018 WNPA closed its operation on Mt. Garfield and left Norton Shores.

20. In 2018 WNPA sold its facility at the Industrial Development District on Mt. Garfield Road to an unrelated business, TGW Systems, Inc. ("TGW").

21. Before buying WNPA's facility on Mt. Garfield, TGW operated its business at another location within the City, which location TGW leased and did not own.

22. During WNPA's business operations from the date of its formation in 2011 to the date of its departure in 2018 it received tax savings under the IFEC 2008 in the amount of $736,233.59.

23. After purchasing WNPA's facility TGW applied to the City for transfer of the IFEC, and its application was approved by the City.

24. TGW and the City entered into an Act 198 Agreement regarding the transfer of the IFEC 2008 and the years remaining under it.

25. Pursuant to Act 198 and the parties' Act 198 Agreement, The Tax Commission issued IFEC 2008, set to expire December 30, 2020, to TGW.

26. Based on an alleged breach of the terms and conditions in the Act 198 Agreement entered into between the City and Wacker Corporation in 2008 and WNPA in 2011, the City sent invoices to WNPA in September 2018 demanding pay back to the City for all abated taxes in the amount of $951,346.94.

27. TGW has continued operating at the facility through the present date.

## II.     ISSUES OF MATERIAL FACT, IF ANY, REMAINING TO BE DETERMINED

At this time the parties do not believe that there are any issues of material fact to be determined, and that the Court can resolve this case via summary judgment.

## III.     THE SPECIFIC LEGAL QUESTIONS TO BE DECIDED BY THE COURT ON MOTIONS FOR SUMMARY JUDGMENT

The parties are unable to agree on language regarding the proper framing of the legal issues, and therefore each submit their own statement of the legal issues to be decided as follows:

**Plaintiff WNPA:**

1. Whether the City may recover from WNPA taxes that were abated in favor of a separate entity, Wacker Corporation, during the time that Wacker Corporation was the applicant for the IFEC certificate pursuant to its own Act 198 Agreement with the City.

2. Whether the contract at issue is ambiguous with respect to the meaning of the terms "Company" and "applicant" and the contractual obligations applicable to each term.

3. Whether the parties' contract requires WNPA to repay taxes abated for 2011-2018 when, before the termination of the certificate on December 30, 2020, WNPA sold the facility at issue to separate entity TGW in 2018, TGW continued and increased operations at the facility, and TGW applied for (and the City approved) transfer of the certificate.

**Defendant City:**

1. Whether WNPA breached the Act 198 Agreement with the City by relocating its production facility out of Norton Shores.

2. Whether the City may recover from WNPA the abated taxes in the principal amount of 736,233.59 under the 2011 Act 198 Agreement between WNPA and the City.

3. Whether the City may recover from WNPA the abated taxes in the principal amount of $215,113.35 under the November 2008 Act 198 Agreement between Wacker Corp. and the City.

4. Whether the Act 198 Agreements are clear and unambiguous.

## IV. BRIEF OUTLINE OF EACH PARTY'S PROPOSED CONCLUSIONS AND EVIDENTIARY SUPPORT.

### A. PLAINTIFF WNPA:

#### 1. Question 1: The City is not entitled to recover from WNPA taxes that were abated in favor of separate entity Wacker Corporation.

Wacker Corporation was the original applicant for the certificate at issue. The certificate at issue went into effect in December 2008, and Wacker Corporation received tax savings in 2009 of $111,599.73 and in 2010 of $103,513.62, for a total of $215,113.35. Wacker Corporation later became known as Wacker Neuson Corporation, and WNPA was formed as a subsidiary of Wacker Neuson Corporation in 2010.

In January 2011, WNPA applied for transfer of the IFEC previously held by Wacker Corporation, and the City approved the transfer in March 2011. As part of the transfer process, WNPA executed a separate Act 198 Agreement with the City, which the parties executed in January and February of 2011. This 2011 WNPA Act 198 Agreement is the contract at issue between the parties in this action.

It is undisputed that Wacker Corporation and WNPA are distinct legal entities. Indeed, this fact was recognized by the City in real time, specifically in the context of tax liability. For tax year 2011, the City's Notice of Assessment reflected Wacker Corporation as the owner and taxpayer for the property. The following year, the Notice of Assessment had a different owner and taxpayer identified: WNPA. The City's Finance Director also confirmed these facts at his deposition.

It is also undisputed that WNPA is not a signatory to the contract between the City and Wacker Corporation (nor could it have been, as it did not even exist at the time). This fact precludes imposing liability on WNPA under that contract. See *AFSCME Council 25 v. Wayne*

*County*, 292 Mich. App. 68, 80; 811 N.W.2d 4 (2011) ("It goes without saying that a contract cannot bind a nonparty.")

Moreover, that Wacker Corporation and WNPA share the name "Wacker" and have an attenuated corporate link – WNPA is one of a number of subsidiaries of the successor to Wacker Corporation – does not give rise to any WNPA liability under the original Wacker Corporation contract with the City.  "[T]he general rule in Michigan is that separate entities, including that of corporation and shareholder, will be respected." *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 853 (6th Cir. 2017) (citing *Wells v. Firestone Tire and Rubber Co.*, 421 Mich. 641; 364 N.W.2d 670 (1984)). While parent companies may occasionally be liable for the liabilities of their subsidiaries under a theories of control, agency, and respondeat superior, those theories do not apply in reverse to render a subsidiary liable for the obligations of its corporate parent. *See Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074 (11th Cir. 2003) ("Corporations are separate legal entities and contracts made by a parent corporation do not bind a subsidiary merely because one corporation owns all of the stock of the other corporation."); *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) ("Perhaps it would be too much to say that a subsidiary can never be liable for a transaction done in the name of a parent, the situation at bar. … But such instances, if possible at all, must be extremely rare, and there is not the slightest evidence of the sort here.");  *see also* § 43.60. Parent and subsidiary corporations and affiliated corporations—Subsidiary's liability for act of parent, 1 Fletcher Cyc. Corp. § 43.60 (same).

Given the foregoing, the tax abatements for tax years 2009 and 2010 that were given to non-party Wacker Corporation, totaling $215,113.35, cannot be recovered from WNPA. Subtracting this amount from the original claimed amount of $951,346.94 leaves only $736,233.59 actually at issue in this litigation.  Thus, at a minimum, the Court should grant partial summary

judgment in favor of WNPA on each of the parties' claims with respect to this portion of the amount in dispute.[1]

### 2.    Question 2: The Act 198 Agreement unambiguously distinguishes between requirements of "The Company" and the "applicant"

The Act 198 Agreement imposes certain obligations on the "Company" (defined to be WNPA) but imposes certain other obligations on the "applicant." The provision at issue in this dispute pertains to the applicant, not the Company:

> 6. **The applicant** shall remain with the local unit during the period of time for which the abatement has been approved and, if the applicant relocates, substantially reduces employment and/or operations, or closes the facility, the applicant shall pay to the affected taxing units an amount equal to those taxes it would have paid had the abatements not been in effect.

The use of the different terms "applicant" and "The Company" is unambiguous and critically significant because the "applicant" for any given IFEC can, and often will, change over time when the certificate is transferred to a new applicant. That is exactly what happened in this case when the IFEC was transferred from Wacker Corporation (the original applicant for the certificate) to WNPA (the second applicant for the certificate) and then to TGW (the next and current applicant for the certificate).

"All contracts … should be construed to ascertain and give effect to the intentions of the parties and should be interpreted to give a reasonable meaning to all of its provisions." *Zahn v. Kroger Co. of Michigan*, 483 Mich. 34, 40–41; 764 N.W.2d 207 (2009). "The use of similar but different terms in a single contract strongly implies that the terms are to be accorded different

---

[1] It is noteworthy that any effort to recover the abated taxes from 2009 and 2010 from Wacker Corporation via an amended counterclaim would be futile, as any such claim is plainly time barred by Michigan's six-year statute of limitations for contract claims.  *See* MCL 500.5807(9).

meanings*." Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 355 (S.D.N.Y. 2013); *see City of Rockford v. 63rd Dist. Court*, 286 Mich. App. 624, 627; 781 N.W.2d 145 (2009) ("[T]he use of different words connotes different meanings.")

If a term is not defined in a contract, Michigan law requires courts to "interpret such term in accordance with its commonly used meaning." *Terrien v. Zwit*, 467 Mich. 56, 76; 648 N.W.2d 602 (2002).  The term "applicant" (unlike the term "The Company") is not specifically defined in the contract, so it must be given its commonly used meaning.  *Auto Owners Ins. Co. v. Seils*, 310 Mich. App. 132, 145; 871 N.W.2d 530 (2015).  "A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract." *Id*.  The commonly used meaning of "applicant" is "someone who formally asks for something." *Applicant*, Merriam Webster, https://www.merriam-webster.com/dictionary/applicant (2/18/2020).

Here, the use of different terms plainly denotes different meanings. "The Company" refers specifically to WNPA, whereas "applicant" refers to an entity that submits an application related to the particular certificate at issue (*i.e.*, "someone who formally asks for something"), rather than any specific entity.  Accordingly, the contract is not ambiguous with respect to the meaning of the different terms "Company" and "applicant."

However, even if the Court were to conclude that the parties' contract was ambiguous with respect to the meaning of Paragraph 6, such ambiguity must be resolved in favor of WNPA under Michigan's rules of interpreting ambiguous contracts.[2]  Here, the City's conduct and past practice with respect to how it has previously interpreted and applied the very provision at issue conclusively establish how that provision should be viewed by this Court.  That is, there is no

---

[2] WNPA anticipates that the City will argue that paragraph 6 of the parties' agreement is unambiguous in its favor.  However, such an argument was conclusively foreclosed at the deposition of Mayor Nelund, when he testified that the City believes the provision to be unclear.

question that an identical clawback provision was included in the original Wacker Corporation Act 198 Agreement, yet the City never took any steps to try to recover previously abated taxes from Wacker Corporation once the certificate was no longer held by Wacker Corporation, despite the fact that Wacker Corporation's responsibility for those taxes was separate and distinct from that of WNPA, as City officials confirmed in their depositions. This conduct and past practice by the City clearly support WNPA's proffered interpretation of the parties' contract.

And, to the extent that there is any ambiguity in the requirements of Paragraph 6 of the parties' agreement, any such ambiguity must be strictly construed against the City, as the drafter of the agreement. It is "an elementary rule of construction of contracts that in case of doubt, a contract is to be strictly construed against the party by whose agent it was drafted." *Shay v. Aldrich*, 487 Mich. 648, 673; 790 N.W.2d 629 (2010). Here, there is no dispute that the City drafted the parties' agreement.

As such, even if the Court were to find the parties' contract ambiguous with respect to the meaning and application of the requirements of Paragraph 6, the foregoing rules of contract interpretation require that any ambiguity be resolved in favor of WNPA's proffered interpretation of the agreement. When that is done, it is clear that WNPA is not liable to the City in any amount, and summary judgment should be granted in WNPA's favor.

3. **Question 3: WNPA did not breach the unambiguous terms of the Act 198 Agreement**

The City claims that WNPA breached Paragraph 6 of the WNPA Act 198 Agreement when it sold the facility and transferred the remainder of the certificate to its new owner and operator, TGW, in 2018. The City is wrong because, in short, the paragraph 6 obligation to "remain with" Norton Shores applies to the "applicant" for the certificate (which became TGW by way of transfer) rather than the "Company" (which is defined to mean WNPA).

As set out above, the use of the different terms "applicant" and "The Company" is unambiguous and critically significant.  The contract imposes certain obligations on "The Company," such as "submit[ting] a letter to the City no later than January 10th immediately following the second year after the issuance of the IFE certifying" certain information regarding the number of jobs created and the actual costs of property acquisitions. *See* WNPA Act 198 Agreement at ¶ 2.  But the obligations in the clawback provision of paragraph 6 are explicitly and conspicuously linked to the "applicant," not "The Company."  By its plain terms, the WNPA Act 198 Agreement (and, for that matter, the prior Wacker Corporation Act 198 Agreement as well) required "the applicant" for the certificate, as opposed to "The Company," to "remain with the local unit." Reading "applicant" as having the same meaning as the defined term "The Company" would be to ignore an important distinction in the plain language of the contract.

This distinction is critically important in this case, because in 2018 TGW became the new "applicant" for the certificate and continued owning and operating the facility, thereby satisfying the requirements in Paragraph 6.  It is undisputed that in 2018 TGW applied for the transfer of the certificate (which the City approved) and entered into a new Act 198 Agreement for the certificate. *See* TGW Application; TGW Act 198 Agreement.   Further, the State of Michigan Department of Treasury considers TGW to be the sole applicant with respect to the certificate, having stepped into the shoes of the original applicant, Wacker Corporation.

In short, while WNPA was "the applicant" for the IFEC at the time it entered into the Act 198 Agreement, it ceased being "the applicant" for that certificate within the meaning of the Act 198 Agreement when TGW applied for and obtained the transfer of the IFEC 2008, thereby replacing WNPA as "the applicant" relative to the specific certificate at issue. And because the

10

new applicant for the certificate has "remained with" the facility, WNPA's obligations under Paragraph 6 of the WNPA Act 198 Agreement were satisfied.

This interpretation of the contract is the only sensible interpretation because it accommodates the common occurrence of IFEC transfers.  Indeed, the certificate in this case was transferred twice: first from Wacker Corporation to WNPA, then from WNPA to TGW.  Transfers are so routine that the application forms themselves ask the applicant to check a box for "new" or for "transfer." Given the ubiquity of certificate transfers, it is no surprise that the Act 198 Agreement is drafted in such a way as to allow a transfer applicant to step into the shoes of a prior applicant in order to satisfy certain conditions of the Act 198 Agreement, rather than strictly requiring the original applicant for the certificate (*i.e.*, "The Company") to remain at its facility even after the certificate for the facility is transferred, with City approval, to a new applicant.

This interpretation of the contract is also reasonable because it gives each party the full benefit of its bargain and does not award a windfall to either side.  To allow the City to recover past tax abatements while <u>also</u> receiving full economic benefits from 12 years of facility operation merely because the name on the door of the facility changed from Wacker Corporation to WNPA or from WNPA to TGW is an absurd, unfair windfall to the City. "[C]ourts avoid interpreting contracts in a manner that would impose unreasonable conditions or absurd results." *Bodnar v. St. John Providence, Inc.,* 327 Mich. App. 203, 223; 933 N.W.2d 363 (2019).  To be sure, if the City was not satisfied with the economic benefit that TGW would bring to the City by moving into the facility, it could have denied TGW's transfer application. Instead, it approved the transfer application, confirming that the City anticipated economic benefits from TGW's operations at the facility.

Indeed, TGW planned to expand its operations at its new Mount Garfield Road facility beyond WNPA's operations at that facility, and also beyond its own operations at the previous facility that it had leased in Norton Shores, as TGW representative Tom Bergy confirmed in his deposition. Upon moving into its new facility, TGW increased its own employment within Norton Shores by 10 – 15% to 240 employees, which was higher than the capacity of its prior facility. City Administrator Mark Meyers agreed that TGW has, in fact, created 20 to 30 more jobs at the facility. TGW also made physical improvements at the facility, doubling the office space from 10,000 square feet to 20,000, for which it received an additional tax exemption certificate. TGW has plans to increase the manufacturing space by 100,000 square feet in the next five years. Because it now owns, rather than rents, property in Norton Shores, TGW now plans to stay there indefinitely.

### B.   DEFENDANT CITY OF NORTON SHORES:

The City of Norton Shores submits that the Act 198 Agreements entered into between the parties (attached to this joint statement) demonstrate clearly their intent. In this regard its Act 198 Agreement with the City committed Wacker to remaining in the City for not less than the full 12 years during which its real and personal property taxes were abated under the IFEC.

The Act 198 Agreement between the City and Wacker Corp in 2008 and Wacker Neuson Production Americas, LLC in 2011 set forth unequivocally the consequence should Wacker breach its commitment to "***remain within the local unit during the period of time for which the abatement has been approved…***"

Wacker agreed that if it should relocate or close its facility it "**shall pay to the affected taxing units an amount equal to those taxes it would have paid had the abatement not been in effect**."

Wacker saved a total of $951,346.94 from the date of commencement of the IFEC issued in 2008 up to the date of its relocation, in breach of its agreement.

Wacker Neuson Production Americas, LLC (WNPA) denies liability to the City under its Act 198 Agreement, for reasons it advances. However, WNPA's alternative claim is that, if it is liable under its Act 198 Agreement, its liability is limited to the time frame extending from its agreement executed in 2011 up to the date of relocation in 2018, amounting to 736,233.59.

In other words, WNPA claims it is not responsible for the tax abatements enjoyed by its parent company, Wacker Corporation between 2008 and 2011 under Wacker Corp.'s 2008 Act 198 Agreement, totaling $215,113.35.

In conclusion, the City submits that the Act 198 Agreements are clear and unambiguous in intent and purpose. Wacker relocated before conclusion of the IFEC, in breach of its commitment to remain for its duration. By its Act 198 Agreement Wacker agreed to pay, in such an event, to the affected taxing units the amount equal to the taxes it saved under the agreement.

The City is entitled to a recovery from WNPA for abated taxes under the Act 198 Agreements.


Dated: September 24, 2020


/s/ Jeffrey D. Koelzer
VARNUM LLP
Adam J. Brody  (P62035)
Jeffrey D. Koelzer (P78602)
*Attorneys for Plaintiff*
333 Bridge St NW
PO Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
jdkoelzer@varnumlaw.com

/s/ John M. Karafa
GRAVIS LAW PLLC
Douglas M. Hughes (P30958)
Enrika L.F. McGahan (P55860)
John M. Karafa (P36007)
*Attorneys for Defendant*
120 W. Apple Avenue
Muskegon, MI 49440
(231) 726-4857
dhughes@gravislaw.com
jkarafa@gravislaw.com

15780979_1.docx